ROBERT PATRICK STICHT (SBN 138586)
PAUL J. ORFANEDES*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, D.C. 20024
Telephone: (202) 646-5172
Fax: (202) 646-5199
Email: rsticht@judicialwatch.org

*Application for admission pro hac vice forthcoming

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF ASHLI BABBITT and
AARON BABBITT, individually and
on behalf of the ESTATE OF ASHLI
BABBITT,

               Plaintiffs,

   v.

UNITED STATES OF AMERICA,

           Defendant.

Case No. **'24CV33   BAS DDL**

**COMPLAINT FOR
ASSAULT AND BATTERY;
NEGLIGENCE; NEGLIGENT
SUPERVISION, DISCIPLINE,
AND RETENTION; NEGLIGENT
TRAINING; SURVIVAL; AND
WRONGFUL DEATH**

     The ESTATE OF ASHLI BABBITT and AARON BABBITT, individually and on behalf of the ESTATE OF ASHLI BABBITT (hereinafter referred to collectively as "Plaintiffs"), by and through their attorneys of record, bring this Complaint against the UNITED STATES OF AMERICA ("Defendant" or "United States"), and allege as follows:

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction over this case by operation of 28 U.S.C. §§ 1331 and 1346(b).

2.     Venue is proper in this district under 28 U.S.C. §§ 1391 and 1402.

**PARTIES**

3.     Plaintiff ESTATE OF ASHLI BABBITT is a decedent's estate.  At the time of her death, ASHLI BABBITT was a citizen of the United States and a resident of San Diego, California.  On April 16, 2021, Ashli's husband, Plaintiff AARON BABBITT, petitioned the Superior Court of California, County of San Diego, for probate of Ashli's will and for letters of administration of her estate.  Letters of administration have been duly issued by the San Diego County Superior Court, most recently on June 12, 2023, are still in effect, and have not expired.  The letters of administration authorize Aaron Babbitt to administer Ashli's estate under the California Independent Administration of Estates Act, Cal. Prob. Code §§ 10400 *et seq*., with full authority, including authority to commence and maintain this action, pursuant to Cal. Prob. Code § 10553, which power is exercisable without giving notice of proposed action under Cal. Prob. Code §§ 10580 *et seq*.

4.     Plaintiff AARON BABBITT is the husband of Ashli Babbitt and the duly appointed personal representative and administrator of her estate.  Aaron is a citizen of the United States and a resident of San Diego, California.  Aaron brings this action in his individual capacity and on behalf of the ESTATE OF ASHLI BABBITT.

5.     Defendant UNITED STATES OF AMERICA is sued pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq*.  This is a civil action based on (1) a claim against the United States, (2) for money damages, (3) for personal injury and death, (4) caused by the negligent or wrongful acts or omissions of one or more employees of the federal government, (5) while acting within the scope of their office or employment, (6) under circumstances where the United States, if a private person,

would be liable to Plaintiffs in accordance with the law of the District of Columbia, where the acts or omissions occurred.  The United States is liable for its employees' acts or omissions in the same manner and to the same extent as a private individual under like circumstances pursuant to 28 U.S.C. § 2674.

6.     Plaintiffs have timely satisfied administrative exhaustion requirements by first presenting their claims to the United States Capitol Police ("Capitol Police" or "USCP") within two years after such claims accrued, as required by 28 U.S.C. §§ 2401 and 2675.  Specifically, Ashli was shot and killed by a Capitol Police officer on January 6, 2021.  Plaintiffs' Standard Form 95 was presented to the Capitol Police, Office of the General Counsel, via fax on April 30, 2021, and via certified mail on May 7, 2021.  Plaintiffs supplemented their claims twice with reports of an expert economist and an expert pathologist.  The first supplement (economist's report) was presented to the Capitol Police, Office of the General Counsel, via fax on June 24, 2021, and via certified mail on June 28, 2021.  The second supplement (pathologist's report) was presented to the Capitol Police, Office of the General Counsel, via fax on September 9, 2021, and via certified mail on September 15, 2021.  Plaintiffs also amended their Standard Form 95 to augment the basis of their claims.  The amendment was presented to the Capitol Police, Office of the General Counsel, via fax on February 7, 2022, and via certified mail on February 8, 2022.  Plaintiffs also presented a Standard Form 95 to the Capitol Police, Office of the General Counsel, via certified mail on January 6, 2023.  The Capitol Police has failed to make a final disposition of Plaintiffs' claims within six months after the claims were presented. The failure to make a final determination may be and is deemed a final denial of Plaintiffs' claims.

7.     The Capitol Police is the federal law enforcement organization responsible for policing the United States Capitol Buildings and Grounds under the direction and support of the Capitol Police Board, which consists of the Sergeant at Arms of the United States House of Representatives, the Sergeant at Arms and

Doorkeeper of the United States Senate, and the Architect of the Capitol.  The Chief of Capitol Police serves in an ex-officio capacity and is a non-voting member of the Board.  Members of the Board are required to attend joint oversight hearings before the Committee on Rules and Administration of the Senate and the Committee on House Administration of the House of Representatives, and these committees are required to conduct not less than one such hearing during each Congress.  The Capitol Police have the power and duty to make arrests within the Capitol buildings and grounds for violations of any law of the United States, the District of Columbia, or any State, or any regulation thereunder.  The House Sergeant at Arms and the Senate Sergeant at Arms have the same law enforcement authority, including the authority to carry firearms, as a member of the Capitol Police.  The Capitol Police Board is responsible for the design, installation, and maintenance of security systems for the Capitol buildings and grounds.  The legislative branch of the United States is a federal agency within the meaning of 28 U.S.C. § 2671, *et seq*.  Officers and employees of the legislative branch, including employees of the Capitol Police, Capitol Police Board, and offices of the House Sergeant at Arms and Senate Sergeant at Arms, are employees of the federal government within the meaning of 28 U.S.C. § 2671, *et seq*.  At all times relevant to this Complaint, these employees were acting within the scope of their office or employment.

## FACTS COMMON TO ALL COUNTS

8.     On January 6, 2021, at 2:44 p.m.,[1] Air Force veteran Ashli Babbitt, age 35, was shot and killed inside the U.S. Capitol by then Lt. Michael Byrd of the U.S. Capitol Police.  The bullet pierced Ashli in her left anterior shoulder, perforated her left brachial plexus, trachea, upper lobe of the right lung and second anterior rib, and landed in her right anterior shoulder.  Ashli fell backwards and landed flat on her back on the marble floor.  Video recordings show her alive and conscious, writhing

---

[1]  Times stated in this Complaint are approximate unless the text or context indicates otherwise.

1    uncontrollably immediately after the shooting.

2         9.    Ashli remained conscious for minutes or longer after being shot by Lt.

3    Byrd.  Ashli experienced extreme pain, suffering, mental anguish, and intense fear

4    before slipping into pre-terminal unconsciousness.  The autopsy report identified the

5    cause of death as a "gunshot wound to left anterior shoulder" with an onset interval of

6    "minutes."  The fact that Ashli was alive and conscious in extreme pain and suffering

7    is documented in videos of the shooting.  Furthermore, nothing about the wound track

8    described in the autopsy report would be expected to result in immediate death or

9    instantaneous loss of consciousness, and Ashli's lungs contained blood, further

10   confirming that she was alive and breathing after being shot.  Ashli was pronounced

11   dead at Washington Hospital Center at 3:15 p.m.  The medical examiner determined

12   that the manner of death was homicide.

13        10.    Ashli had been living in San Diego, California, where she and Aaron

14   owned and operated a successful pool business with her husband Aaron.  Ashli

15   traveled alone from San Diego to Washington, D.C. on January 5, 2021, to attend the

16   Women for America First (aka Save America) rally the next morning at the Ellipse,

17   located just south of the White House.  The rally featured President Trump and

18   prominent conservative speakers.  Ashli loved her country and wanted to show her

19   support for President Trump's America First policies and to see and hear the

20   president speak live while he remained in office.  Ashli did not go to Washington as

21   part of a group or for any unlawful or nefarious purpose.  She was there to exercise

22   what she believed were her God-given, American liberties and freedoms.

23        11.    After the rally, Ashli, like a great many other patriotic Americans

24   attending the rally, walked to the Capitol peacefully, a distance of approximately 1.5

25   miles.  Two undercover Metropolitan Police Department officers followed close

26   behind Ashli as she climbed the stairs to the West Terrace.  Ashli entered the Capitol

27   on the Senate side long after others had done so.  Once inside, Ashli encountered a

28   female Capitol Police officer, who directed her to walk south toward the House side.

Ashli complied, walking alone through the Capitol and ultimately arriving at the hallway outside the main door to the House chamber, where demonstrators had gathered.  From there, Ashli walked by herself east, along the hallway outside the House chamber, then turned south, reaching the hallway outside the Speaker's Lobby at the southeast corner of the Capitol.

12.    The Speaker's Lobby is a long, rectangular corridor behind or at the rear of the House chamber that features portraits of past Speakers of the U.S. House of Representatives.  Behind the Speaker's Lobby is the Retiring Room, an adjoining corridor of similar size and shape where members and invited guests can relax between votes or wait to access the chamber.

13.    The Speaker's Lobby has entranceways at both ends of the corridor that feature rectangular double doors with glass panels, matching sidelights, and glass transoms that fill both openings to the lobby.  Just outside each entranceway is a small, narrow hallway with a stairwell that leads down to the first floor below.

Photo of east entranceway to Speaker's Lobby



14.     The shooting occurred at the east entrance to the Speaker's Lobby.  After demonstrators filled the hallway outside the lobby, two individuals in the crowded, tightly packed hallway struck and dislodged the glass panels in the lobby doors and the right door sidelight.  Lt. Byrd, who is a USCP commander and was the incident commander for the House on January 6, 2021, shot Ashli on sight as she raised herself up into the opening of the right door sidelight.  Lt. Byrd later confessed that he shot Ashli before seeing her hands or assessing her intentions or even identifying her as female.  Ashli was unarmed.  Her hands were up in the air, empty, and in plain view of Lt. Byrd and other officers in the lobby.  Ashli posed no threat to the safety of anyone.  Not one member of Congress was in the lobby, which was guarded by multiple armed police officers.  Additional armed police officers were in the hallway outside the lobby and/or on the adjoining stairway.  Ashli could not have seen Lt. Byrd, who was positioned far to Ashli's left and on the opposite side of the doors, near an opening to the Retiring Room, a distance of approximately 15 feet and an angle of approximately 160 degrees.  Sgt. Timothy Lively, one of the armed officers guarding the lobby doors from the hallway, later told officials investigating the shooting, "I saw him . . . there was no way that woman would've seen that."  Lt. Byrd, who was not in uniform, did not identify himself as a police officer or otherwise make his presence known to Ashli.  Lt. Byrd did not give Ashli any warnings or commands before shooting her dead.

15.     At 2:45 p.m., or within one minute *after* shooting Ashli, Lt. Byrd made the following radio call:

> 405B.  We got shots fired in the lobby.  We got shots shots fired in the lobby of the House chamber.  Shots are being fired at us and we're sh, uhh, prepared to fire back at them.  We have guns drawn.  Please don't leave that end.  Don't leave that end.

Approximately 35 seconds later, Lt. Byrd made another radio call, stating, "405B. We got an injured person.  I believe that person was shot."  In fact, no shots were

fired at Lt. Byrd or his fellow officers.  The only shot fired was the single shot Lt. Byrd fired at Ashli.  He heard the loud noise of the gunshot.  He saw her fall backwards from the window frame.

16.    The facts speak truth.  Ashli was ambushed when she was shot by Lt. Byrd.  Multiple witnesses at the scene yelled, "you just murdered her."

17.    Lt. Byrd was never charged or otherwise punished or disciplined for Ashli's homicide.

**COUNT I**

**<u>Assault and Battery</u>**

**(Intentional Shooting and Killing of Ashli by Lt.**

**Byrd - ESTATE OF ASHLI BABBITT)**

18.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

19.    The Federal Tort Claims Act applies to any claim arising out of assault, battery, and other listed torts with regard to acts or omissions of investigative or law enforcement officers of the United States.  28 U.S.C. § 2680(h); *see also id*. at §§ 1346(b), 2674; D.C. Code § 12-101.

20.    On January 6, 2021, Lt. Byrd, by his own admissions, intentionally shot Ashli with his firearm.  At the time of the shooting, Lt. Byrd was an employee of the federal government acting within the scope of his employment with the USCP.  28 U.S.C. § 2671.

21.    Lt. Byrd fatally injured Ashli as a direct result of the shooting.

22.    The shooting was not privileged, without legal justification, and non-consensual.  *Graham v. Connor*, 490 U.S. 386 (1989); *Tennessee v. Garner*, 471 U.S. 1 (1985); *Etheredge*, 635 A.2d at 916.

23.    The United States is liable for Lt. Byrd's assault and battery against Ashli.

//

//

## COUNT II

## Negligence

## (Lt. Byrd - ESTATE OF ASHLI BABBITT)

24.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

25.     Under District of Columbia law, it is well-established that a police officer's lack of due care can give rise to negligence liability for the intentional shooting death of a subject. *District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003); *District of Columbia v. White*, 442 A.2d 159 (D.C. 1982); *Moore v. District of Columbia*, 79 F. Supp. 3d 121 (D. D.C. 2015); *Reed v. District of Columbia*, 472 F. Supp. 2d 163 (D. D.C. 2007); *Austin v. District of Columbia*, 2007 U.S. District LEXIS 34793 (D. D.C. 2007).

26.     In a negligence action under D.C. law, a plaintiff must prove "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Etheredge*, 635 A.2d 908, 916 (D.C. 1993).

27.     In police cases involving excessive use of force, the applicable standard of care is the duty to act as a reasonably prudent police officer. *Smith v. District of Columbia*, 882 A.2d 778, 790 (D.C. 2005); *White*, 442. A.2d 159; *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 30-31 (D.D.C. 2011). The standard of care "is to be found in the practices in fact generally followed by other comparable governmental facilities or some nationally recognized standard." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 936 (D.C. 2007) (internal quotations, and citations omitted).)

28.     USCP Directive 2053.013, the Capitol Police's rules for ensuring "exemplary standards of personal integrity and the highest professional standards of conduct," and USCP Directive 1020.004, its regulation on the safe use of firearms and use of force generally, both bear on the standard of care expected of Lt. Byrd when he shot and killed Ashli on January 6, 2021. Each directive is consistent with

the police policies, practices, and procedures generally followed by other comparable governmental facilities and/or nationally recognized standards as well as the duty to act as a reasonably prudent police officer.  Both directives were in effect on January 6, 2021.[2]

29.    Additionally, Lt. Byrd was the designated "incident commander" for the House on January 6, 2021.  The USCP, like most major law enforcement agencies, has adopted the National Incident Management System ("NIMS"), making it a key part of the USCP's policies and procedures.  NIMS is a standardized, on-scene emergency management system designed to aid in the management of resources during incidents.  It requires an agency to identify an incident commander who will establish an incident command system to manage and coordinate the response to an emergency.  Incident commanders may be designated by location where an incident occurs over a broader area.  Everyone has a designated role to help support the incident commander.  Lt. Byrd's role as incident commander for the House on January 6, 2021 bears substantially on the standards of care that apply to his conduct on that date.

30.    When Lt. Byrd shot and killed Ashli on January 6, 2021, he breached multiple, applicable standards of care governing (A) the safe use of a firearm; (B) the perception and assessment of imminent threats; (C) use of force levels and escalation/de-escalation of force; (D) the perception and assessment of relevant facts; (E) the use of warnings; (F) firing backdrops; and (G) obtaining timely, appropriate medical aid, among other breaches to be identified through discovery.  Had Lt. Byrd adhered to these standards, he would not have fired, and Ashli would be alive today.

//

//

---

[2]  USCP's Civil Disturbance Unit's (CDU) operational plan stated that all officers were to follow the Capitol Police's use of force policy and that unless exigent circumstances justify immediate action, officers were not to independently make arrests or employ force including less-lethal force.

### A.   <u>Negligent Use of Firearm</u>

31.     USCP Directive 2053.013 states with respect to the safe use of firearms,

Sworn employees will not discharge any firearm, nor use or handle any weapon, in a careless or imprudent manner.  Sworn employees will carry, store, secure and/or use all firearms and weapons in accordance with applicable laws and the established procedures of the Department.

32.     USCP Directive 1020.004 states with respect to the safe use of firearms,

Firearms may be withdrawn from their holsters only when officers are preparing for its expected, prudent, and lawful discharge:  to protect themselves or others from imminent death or serious physical injury.

***

To avoid unintentional discharges, officers must keep their fingers off the triggers and outside the trigger guards until firing is imminent.

33.     Under USCP Directives 2053.013 and 1020.004, other generally accepted regulations governing the safe use of firearms and firearms training, and the duty to act as a reasonably prudent police officer, Lt. Byrd was required to adhere to the following standards of care, among others, on January 6, 2021:  (a) to refrain from using or handling his firearm in a careless or imprudent manner; (b) to holster his firearm until the moment when a reasonably prudent police officer would believe and therefore prepare for its expected, prudent, and lawful discharge; and (c) to keep his finger safely off the trigger of a firearm and outside the trigger guard until the moment when a reasonably prudent police officer would believe that firing is imminent.

34.     Lt. Byrd breached these standards of care in the following ways, among others to be identified through discovery:  (a) unholstering his firearm before he even saw Ashli and therefore before any "expected, prudent, and lawful discharge," while leaving his position in the Retiring Room and advancing and moving to the doors of the Speaker's Lobby; (b) failing to maintain his unholstered weapon at "low ready" and instead pointing his firearm at no fewer than three people on the other side of the lobby doors and in the direction of Ashli and as many as seven uniformed officers positioned near her in the hallway; and (c) holding his finger inside the trigger guard

1   and tapping his finger on and off the trigger for at least 14 seconds before he saw and

2   shot Ashli.

3                    **B.    Negligent Perception/Assessment of Imminent Threat**

4          35.    Under USCP Directive 1020.004, deadly force is authorized only when

5   "the officer perceives that the subject poses an imminent danger of death or serious

6   physical injury to the officer or to another person."

7          36.    Under USCP Directives 2053.013 and 1020.004, generally accepted

8   police standards regulating the safe use of firearms and training, and the duty to act as

9   a reasonably prudent police officer, Lt. Byrd was required to refrain from aiming his

10  firearm at Ashli and pulling the trigger until a reasonably prudent police officer

11  would have perceived her as an imminent threat to his life or the life of another

12  person.

13         37.    Lt. Byrd breached this standard of care by failing to diligently assess the

14  appropriateness of using deadly force against Ashli.  Specifically, Lt. Byrd admitted

15  during an interview on NBC Nightly News with Lester Holt that he "had no clue"

16  about the person he shot and that it did not matter whether the person was armed.[3]  "I

17  didn't even know it was a female until hours, way later . . . that night," he added.

18  Instead of diligently assessing the appropriateness of using deadly force against Ashli

19  as an individual at the moment he shot and killed her at 2:44, p.m., Lt. Byrd

20  negligently, if not recklessly, assessed all persons inside the Capitol as an "imminent

21  danger" to House members at the point "[w]hen the announcement came that the

22  Capitol had been breached" at 2:12 p.m.  "[M]y rules of engagement never changed,"

23  Lt. Byrd said.

24  //

25  //

26  //

27         [3]  All statements of Lt. Byrd quoted in this Complaint were made during his
    August 26, 2021 exclusive interview on NBC Nightly News with Lester Holt unless
28  the text or context indicates otherwise.

### C.   Negligent Use of Force Levels/Failure to De-Escalate

38.   USCP Directive 2053.013 provides:

Sworn employees will use only such force in any situation that is reasonably necessary under the circumstances, in accordance with applicable laws and the established procedures and training of the Department.

39.   USCP Directive 2053.013 provides:

Every arrest, search, and seizure will be in accordance with applicable laws and the established procedures of the Department.

40.   USCP Directive 1020.004 provides:

It is the policy of the Department to allow officers to use only the level of force that appears reasonably necessary to effectively accomplish their lawful objective (bring a subject under control), while protecting the lives of officers and others.  The goal of using force is to gain control of the subject(s).

41.   According to USCP Directive 1020.004, the Department recognizes the following five levels of force that may be applied by officers during the performance of their official duties:

(1)   "Cooperative Controls.  This level of force includes methods to preserve officer safety and survival including officer presence, communication skills, and restraint applications.  These controls can also be used at all levels within the parameters of use of force."

(2)   "Contact Controls.  When confronted with a subject demonstrating resistant behavior, the officer uses low-level physical tactics to gain control and compliance.  These tactics can be physical, and can include additional verbal persuasion skills, relative positioning strategies, and escort positions."

(3)   "Compliance Techniques.  When the subject becomes actively resistant, the officer uses physical control tactics.  These tactics should be of sufficient force to overcome the subject's active resistance, and the officer should remain vigilant for more aggressive behavior from the subject."

(4)   "Defensive Tactics.  At this level, the subject attempts or achieves an assault on the officer or another person.  The officer is justified in using defensive countermeasures designed to cease the subject's non-lethal assault on the officer or others, regain control, and assure continued compliance.  These tactics include baton strikes and striking and blocking techniques."

(5)   "Lethal Force.  When the officer perceives that the subject poses an imminent danger of death or serious physical injury to the officer of to another person, immediate countermeasures must be used to stop the threat.  These tactics include the discharge of a firearm and other forms of lethal force."

42.   USCP Directive 1020.004 provides:

Officers should escalate and de-escalate the amount of force they use in accordance with the subject(s) actions.  Once the subject is under control, the officer must de-escalate the amount of force to the lowest level necessary to maintain control.

43.   USCP Directive 1020.004 provides, "The officer may also await backup officers and show strength in numbers."

44.   Under USCP Directive 1020.004, "[t]he use of lethal force solely to effect or maintain a detention (stop) is prohibited."

45.   Under USCP Directives 2053.013 and 1020.004, generally accepted police standards regulating the safe use of firearms and training, and the duty to act as a reasonably prudent police officer, Lt. Byrd was required to (a) bring the appropriate level of force to the demonstration in the hallway outside the Speaker's Lobby, and (b) to de-escalate to the lowest level necessary to control Ashli.

46.   Lt. Byrd breached this standard of care by entering the demonstration at Level 5, the highest level of force, unholstering his firearm, and pointing it at Ashli and others through the windows of the east lobby doors, among other breaches to be identified through discovery.  Lt. Byrd's firearm was also aimed in the direction of four officers from the USCP's elite and well-armed Containment and Emergency Response Team (CERT), who had just reached the hallway after ascending a stairway

from the lower floor, three other uniformed USCP officers who were descending the same stairway, a House Sergeant at Arms employee, and, on information and belief, other federal law enforcement officials in the hallway.

47.     Lt. Byrd also breached this standard of care when, upon seeing Ashli in in the window opening, he failed to apply only that level of force that a reasonably prudent police officer would find necessary to control Ashli in accordance with her actions.  Lt. Byrd failed to remain flexible in the level of force he used.  He did not, for example, holster his firearm, make his presence known to Ashli, or identify himself as a police officer.  He also did not warn Ashli of the consequences of advancing beyond the window and over the barricade bracing the lobby doors.  Nor did Lt. Byrd attempt less than lethal means to apprehend Ashli, a factor that is especially significant given that at least four other armed officers were in the lobby with Lt. Byrd to assist him in apprehending (i.e., stopping, detaining, and/or arresting) Ashli if necessary and at least seven other armed officers were either in the hallway with Ashli or on the stairs leading to the hallway.  Indeed, Lt. Byrd negligently if not recklessly believed that, rather than applying only the level of force that a reasonably prudent police officer would find necessary to control Ashli in accordance with her actions, it was his job to shoot Ashli and/or anyone else who attempted to trespass the lobby doors.  "I hoped and prayed no one tried to enter through those doors," Lt. Byrd said when asked what made him pull the trigger.  He also added, "no one else attempted to enter into that hall" after or because he fired upon Ashli killing her.

### D.     Negligent Perception/Assessment of Facts

48.     Under USCP Directives 2053.013 and 1020.004, generally accepted police standards regulating the safe use of firearms and training, and the duty to act as a reasonably prudent police officer, Lt. Byrd's tactical conduct and decisions preceding the use of deadly force are relevant considerations, and, in particular, Lt.

Byrd was required to accurately perceive and assess the facts and circumstances of his confrontation with Ashli before using deadly force against her.

49.     Lt. Byrd, who as a commander and the incident commander for the House on January 6, 2021 had a heightened obligation to have accurate and complete information, breached this standard of care by misperceiving the following key facts and circumstances, among others to be identified through discovery, and failing to use due diligence to perceive and assess these same key facts and circumstances accurately, before he used deadly force against Ashli:

        a.     Lt. Byrd erroneously believed there were approximately "60 to 80 people" in the House chamber when he shot and killed Ashli "and that was just members and . . . their staff," he said.  A reasonably prudent officer in Lt. Byrd's position would have been aware that, in fact, only six members who chose not to evacuate, including five members with law enforcement and/or military backgrounds and one undefeated mixed martial arts champion, remained on the House floor, all of whom were being guarded by armed officers.  A reasonably prudent officer in Lt. Byrd's position also would have been aware that, although twelve to fifteen additional House members and staff were in the House gallery, these individuals were one level above the House floor – a location that could not be accessed directly from the main level of the chamber – and were guarded by additional armed officers.

        b.     Lt. Byrd erroneously believed that members with mobility issues were present in the Speaker's Lobby with him at the time of the shooting.  "We had a few members that are, um, I don't want to say disabled or, uh, have, you know, um, limitations as far as being able to run or move fast, and some of those individuals were, uh, directly in the lobby with me at the time of the incident," he said.  A reasonably prudent officer in Lt. Byrd's position would have been aware that, in fact, no members, disabled or otherwise, were present in the lobby at the time of the shooting.

        c.     Lt. Byrd erroneously believed that any breach of the Speaker's

Lobby doors was significant because, "If they get to that, through that door they're in the House chamber and upon the members of Congress," he said, referring to the demonstrators outside the lobby doors.  A reasonably prudent officer in Lt. Byrd's position would have been aware that, in fact, the demonstrators were nowhere near the House members, most of whom had been evacuated.  A reasonably prudent officer in Lt. Byrd's position also would have been aware that the east lobby doors were nearly impassible because he and others had erected a barricade of heavy furniture and chairs inside the east lobby doors to further limit if not prevent access to the Speaker's Lobby.  Also, the windows in the east lobby doors were narrow and would allow only one fit person at a time to pass through them if they were breached.  A person passing through a window also would have to climb over the barricade before stepping foot on the lobby floor, where he or she then would have to contend with at least five armed officers, including Lt. Byrd, to reach the locked House chamber doors.

Moreover, a reasonably prudent officer in Lt. Byrd's position would have been aware that the few House members and others who remained in the Chamber were protected not only by Lt. Byrd and the four other armed officers in the lobby just inside the east lobby doors, but several additional armed officers were located at the west lobby doors, more armed officers were on the House floor and in the House gallery, and additional police units had been called to Lt. Byrd's location in the east lobby at 2:41 p.m., only three minutes before Lt. Byrd fired his weapon, with the following radio call:

> 522V.  "The crowd at the House main door is heading around to the glass doors on the rear now of the chambers.  You need all units to go there and hold the glass."

A reasonably prudent officer in Lt. Byrd's position would have been aware of the call because, not only was Lt. Byrd both a commander and the incident commander for the House on January 6, 2021, but USCP Directive 2053.013 requires all employees

who are assigned radio and/or other communications equipment to "keep said equipment turned on and on the appropriate channel at all times while on duty."

        d.    Lt. Byrd erroneously believed and acted on a false radio call and/or false report of shots fired on the House floor occurring before he left the House floor and moved across the Speaker's Lobby to the adjacent Retiring Room. "[T]here was reports of shots fired through the House main door onto the floor of the chamber," he said. "Of course that changes your postures," he added. "I drew my weapon" and "[took a] tactical defensive stance and posture to protect myself," Lt. Byrd said. A reasonably prudent officer in Lt. Byrd's position would have been aware that, in fact, the report was false and the sound heard on the House floor was glass breaking, not shots fired. A reasonably prudent officer in Lt. Byrd's position would not have relied on the call without some investigation because Sgt. Paul McKenna canceled the call almost immediately after it was made and announced that the sound was glass breaking, then re-issued the shots fired call, creating substantial uncertainty about the call's accuracy. Lt. Byrd was in a position to communicate verbally with Sgt. McKenna as well as with others on the House floor, including Officer Reggie Tyson and Congressman Troy Nehls, a career law enforcement veteran also on the House floor, both of whom heard the sound and believed and/or determined it was glass breaking as a result of a flagpole penetrating the glass on the House main door, not shots fired. Shards of glass also were visible on the House floor.

        e.    Lt. Byrd erroneously believed he was "trapped" because he and others had barricaded the lobby doors at both ends of the lobby. "Once we barricaded the doors we were essentially trapped where we were," he said. "Uh, there was no way to retreat, uh, no other way to, uh, get out, uh, because we had did both sides of that corridor, so you're essentially trapped," he added. A reasonably prudent officer in Lt. Byrd's position would have been aware that, in fact, only the doors on the east end of the lobby had been barricaded. The doors on the west end, which were used to

1  evacuate House members from the chamber, had not been barricaded and remained
2  open at the time of the shooting.

3          f.     Lt. Byrd erroneously believed there were no officers present in the
4  hallway on the opposite side of the east lobby doors.  "I had no knowledge that those
5  officers were there, I had no visual or communication with them," he said.  "There
6  was no call over the radio, uh, explaining to me that these officers were there," he
7  said.  A reasonably prudent officer in Lt. Byrd's position would have been aware that,
8  in fact, three armed USCP officers had been ordered to guard the barricaded east
9  lobby doors and were standing in the hallway with their backs to the doors until just
10  moments before the shooting, when they moved to the adjacent wall then began
11  descending the stairs to the lower level as four CERT officers reached the hallway
12  after ascending the stairs.  Not only should Lt. Byrd, as incident commander, have
13  known that the three officers were in the hallway just outside the east lobby doors,
14  but the officers were clearly visible from inside the lobby through the lobby door
15  windows.  All three officers were in uniform, their police patches were visible
16  through the windows, and at least one was wearing a USCP ballcap.  Also present
17  was a House Seargent at Arms employee who had twenty years' experience with the
18  Capitol Police, including as an agent and uniformed officer, and, on information and
19  belief, other federal law enforcement employees.

20          g.     Lt. Byrd also erroneously believed he was the "last line of
21  defense" against the demonstrators.  "[A]s an officer, you rely on our CERT which is,
22  you know, our, our containment team, and if they don't make it there to, uh, stop the
23  threat you're the last line of defense and it's up to you to take the appropriate action
24  based on the circumstances," he said.  Especially given his role as incident
25  commander for the House, a reasonably prudent officer in Lt. Byrd's position would
26  have been aware that, in fact, in addition to the three, armed, uniformed officers
27  outside the east lobby doors, four CERT officers had reached the east lobby hallway
28  before Lt. Byrd shot and killed Ashli.

Complaint for Assault and Battery, Negligence, Survival and Wrongful Death
- 19 -

h.     Lt. Byrd erroneously believed there were hundreds of people in the hallway outside the east lobby doors.  "[T]he chants got louder, I couldn't make out what they were saying, but it sounded like hundreds of people outside of that door," he said.  A reasonably prudent officer in Lt. Byrd's position would have been aware that, in fact, the hallway outside the east lobby doors is too small to hold hundreds of people.  One of the uniformed officers guarding the doors, Officer Christopher Lanciano, estimated the crowd size at between fifteen and twenty individuals.  While a second uniformed officer guarding the doors, Officer Kyle Yetter, estimated the crowd size as between sixty and eighty individuals, video of the demonstration in the hallways shows that the former estimate is closer to the real number.

i.     Lt. Byrd erroneously believed that the demonstrators in the hallway had caused more property damage than was the case.  "[T]hey were knocking down all of the barricades and crashing through the doors and windows of, of, of the, um, east lobby," he said.  A reasonably prudent officer in Lt. Byrd's position would have been aware that, in fact, the barricade had not been knocked down by the demonstrators and no one had crashed through the doors.  Only the windows had been broken by demonstrators Zachary Alam and Chad Jones, both of whom were clearly visible to Lt. Byrd because he can be seen on video aiming his firearm at them just before he shot and killed Ashli.

j.     Lt. Byrd erroneously believed he shot Ashli "to save the lives of members of Congress and myself and my fellow officers," believing Ashli was "a threat."  A reasonably prudent officer in Lt. Byrd's position would have been aware that, in fact, Ashli was unarmed, small in stature, and did not pose a threat of imminent death or serious physical injury to Lt. Byrd or anyone else by merely climbing through the window.  Lt. Byrd admitted, "I could not fully see her hands or what was in the backpack or what the intentions of."  "[I]t was later, you know, I found out that the subject did not have a weapon," he added.

# E.   Negligent Failure to Warn

50.     USCP Directive 1020.004 authorizes an officer to use lethal force to apprehend or prevent the escape of a fleeing felon when four conditions are met, including, "[w]hen practical, the officer identifies himself/herself as a police officer and gives the subject a warning of the imminent use of lethal force."

51.     USCP Directive 1020.004 bears on the standard of care that Lt. Byrd owed to Ashli and, under USCP 1020.004, generally accepted police standards regulating the safe use of firearms and training, and the duty to act as a reasonably prudent police officer, Lt. Byrd was required to identify himself as a police office and issue an appropriate warning to Ashli before shooting and killing her.  This duty would have been all the more obvious to a reasonably prudent police officer because Ashli was not a fleeing felon, and the circumstances did not establish that she posed a threat of imminent death or serious physical injury to anyone.

52.     Lt. Byrd, who was not in uniform and was wearing a facemask, breached this standard of care, among other breaches to be identified through discovery, by (a) failing to identify himself as an armed police officer; (b) failing to give Ashli explicit verbal commands and warn her of the consequences of disobeying those commands; and (c) failing to give Ashli an opportunity to comply with explicit verbal commands and warnings before he shot and killed her.

53.     In fact, Lt. Byrd did not give Ashli any commands or warnings.  Any commands or warnings Lt. Byrd believes he may have given could only have been directed at Alam and Jones, the two individuals who were striking the lobby doors and shattering the glass panels in the doors.  Moreover, Lt. Byrd admitted that "it's possible" his "warning" was inadequate.  "It is possible," he said, that people on the other side of the lobby doors could not hear him, because he could not hear what they were saying.  Nor could people see Lt. Byrd verbally speaking.  "I know it was difficult for anyone to see me verbally speaking because we were wearing, uh, the masks because of COVID," he said.

### F.   <u>Negligent Firing Into a Crowd</u>

54.     Under basic firearm safety rules, no target is so important that an officer cannot take the time before he pulls the trigger to be certain of his target and where his shot will stop if it misses the intended target or ricochets in another direction.

55.     Under these basic safety rules, generally accepted police standards regulating the safe use of firearms, and the duty to act as a reasonably prudent police officer, Lt. Byrd was required to make sure he knew who and what was behind Ashli before he pulled the trigger.

56.     Lt. Byrd breached this standard of care by firing at Ashli when three USCP officers, four CERT officers, House Sergeant at Arms employee, and, on information and belief, other federal law enforcement employees were behind Ashli or otherwise in Ashli's immediate vicinity.  The hallway also was crowded with demonstrators in harm's way of a stray bullet.  Had Lt. Byrd adhered to this standard, he would not have fired, and Ashli would be alive today.

### G.   <u>Negligent Obtaining of Timely Medical Aid</u>

57.     USCP Directive 1020.004 provides:

> Officers and supervisors are required to obtain appropriate medical aid as soon as possible or practical for individuals:
>
> a.     Who show signs of any injury as a result of use of force.
>
> \*\*\*
>
> d.     When the officer or supervisor believes an individual is in need of medical evaluation as a result of any use of force.

58.     Under USCP Directive 1020.004, generally accepted police standards regulating the safe use of firearms and training, and the duty to act as a reasonably prudent police officer, Lt. Byrd was required to obtain appropriate medical aid for Ashli as soon as possible after shooting her.

59.     Lt. Byrd breached this standard of care by failing to obtain appropriate medical aid for Ashli.  In fact, instead of immediately calling for medical aid, Lt.

Byrd waited up to one minute, then used his radio to make a false report of shots fired at officers in the Speaker's Lobby. Lt. Byrd then waited another 35 seconds to report "an injured person" was "shot." The second radio call did not report the critical information needed to potentially save Ashli's life. In fact, those details were not broadcast until 2:47 p.m., or three minutes after the shooting, when the following radio call was made by someone other than Lt. Byrd:

> [Unknown male] Don't know if this went out over the radio. We've got one civilian down with a GSW to the chest. They're on the east side of the House lobby area. If we can have responding medical units respond from the west side of the House lobby we need it ASAP. ***

60.     As a direct result of these and other breaches to be identified through discovery, individually or collectively, Lt. Byrd negligently, if not recklessly, shot and fatally injured Ashli.

61.     The United States is liable for Lt. Byrd's negligence.

## COUNT III

### Negligence

**(Timothy Lively, Kyle Yetter, Christopher Lanciano**

**Steven Robbs, Don Smith, Brandon Sikes, Mike Brown**

**Jason Gandolph - ESTATE OF ASHLI BABBITT)**

62.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

63.     As law enforcement officers on the scene, Sgt. Timothy Lively, Officer Kyle Yetter, Officer Christopher Lanciano, and CERT officers Steven Robbs, Don Smith, Brandon Sikes, and Mike Brown owed Ashli a duty to act as reasonably prudent officers to protect her from harm. Jason Gandolph, who had arrest authority owing to his status as a House Sergeant at Arms employee and therefore was a law enforcement officer, also owed Ashli this same duty.

64.     On January 6, 2021, Sgt. Lively, Officer Yetter, and Officer Lanciano were ordered to stand guard in the hallway outside the Speaker's Lobby. The officers were talking in front of the east lobby doors when Ashli entered the hallway and

walked up to where they were positioned.  Seeing Ashli, the officers formed a line in front of the doors.  Sgt. Lively was standing in the center of the lobby doors.  Officer Yetter was standing on his right side, and Officer Lanciano was standing on his left side.  Independent journalist Tayler Hansen caught up to and followed Ashli into the hallway.  Hansen recorded the scene on video and also spoke with the officers briefly.

65.    Within two minutes, approximately thirty demonstrators filled the narrow hallway.  Zachary Alam made his way to the lobby doors and, reaching over the officers, began striking the doors and the glass panels in the doors and sidelights. Alam cracked the glass of both the left door and the left door sidelight as Sgt. Lively, Officer Yetter, and Officer Lanciano stood with their backs to the doors and did nothing to control or stop him.  At one point, Alam was directly next to Ashli and directly in front of Officer Lanciano as Alam struck the glass of the right lobby door sidelight in the small, tightly packed hallway.

66.    Video recordings show Ashli, a U.S. Air Force veteran who had served as a military police officer and guarded high-value military assets and troops and high-level national security officials and dignitaries in the Middle East as well as captured terrorists and even nuclear weapons, plainly distressed by Alam's unrestrained conduct.  Standing directly in front of Sgt. Lively, Officer Yetter, and Officer Lanciano, she pleaded with the officers to do something, shouting as loud as she could, "Call fucking help!"

67.    Instead of controlling, de-escalating, or stopping Alam, Sgt. Lively, Officer Yetter, and Officer Lanciano moved away from the doors and stood along the adjacent wall to the right of the doors.  They then began exiting the hallway using the stairway along the right-side wall, passing Ashli in the small, crowded space.  As they did so, CERT officers Robbs, Smith, Sikes, and Brown arrived on the scene, ascending the same stairway, which itself was crowded.  The first CERT officer to reach the hallway was only a few steps from Ashli.

68.    When Sgt. Lively and Officers Yetter and Lanciano moved to the wall,

Chad Jones joined Alam in striking the doors and glass panels, again only steps from Ashli in the narrow, crowded hallway.  Alam dislodged the glass panel in the right door, then moved to his right, striking, then dislodging, the glass panel in the right door sidelight through which Lt. Byrd shot and killed Ashli moments later.  Ashli was directly behind Alam in the tightly packed space.  Jones struck and dislodged the glass panel in the left door, then removed the panel and placed it on the floor.

69.    Sgt. Lively, Officer Yetter, Officer Lanciano, and CERT officers Robbs, Smith, Sikes, and Brown were all at the scene, yet none of them did anything to control, de-escalate, or stop Alam or Jones.  Nor did they call for backup.

70.    Gandolph, a twenty-year veteran of USCP, was also present at the scene while Alam and Jones struck the doors and glass panels and was at one point directly behind Ashli.  Like Sgt. Lively, Officer Yetter, Officer Lanciano, and CERT officers Robbs, Smith, Sikes, and Brown, Gandolph did nothing to control, de-escalate, or stop Alam or Jones, nor did he call for backup.

71.    Sgt. Lively and Officers Yetter and Lanciano breached their duty to act as reasonably prudent officers by not only disobeying the order to guard the doors and abandoning their post, but also by doing nothing to control, de-escalate, or stop Alam and Jones and failing to call for backup, among other breaches to be identified through discovery.

72.    CERT Officers Robbs, Smith, Sikes, and Brown and Gondolph likewise breached their duty to Ashli to act as reasonably prudent officers by doing nothing to control, de-escalate, or stop Alam or Jones and failing to call for backup, among other breaches to be identified through discovery.

73.    As a direct result of these and other breaches to be identified through discovery, Ashli Babbitt was shot and fatally wounded.

74.    The United States is liable for the negligence of Sgt. Lively, Officer Yetter, Officer Lanciano, CERT Officers Robbs, Smith, Sikes, and Brown, and House Sergeant at Arms employee Gandolph.

**COUNT IV**

**Negligent Supervision, Discipline, and Retention of Lt. Byrd**

**(Capitol Police, Capitol Police Board, *et al.* - ESTATE OF ASHLI BABBITT)**

75.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

76.    "Liability for negligent supervision arises when an 'employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.'" *Godfrey v. Iverson*, 559 F.3d 569, 571 (D.C. Cir. 2009) *quoting Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001); *see also James v. District of Columbia*, 869 F. Supp. 2d 119, 121 (D.C. 2012) ("To succeed on a claim of negligent supervision, the plaintiff must prove 'that the employer breached a duty to the plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to plaintiff.'"), *quoting Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002); *Moore v. District of Columbia*, 79 F. Supp. 3d 121, 142-43 (D. D.C. 2015); *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 31-32 (D. D.C. 2011).)  A plaintiff must also aver, and ultimately prove, that the employer's negligence was a "substantial factor" in causing the plaintiff's injury.  *Kivanc v. Ramsey*, 407 F. Supp. 2d 270, 274 (D. D.C. 2006), *citing Tarpeh-Doe v. United States*, 28 F.3d 120, 124 (D.C. Cir. 1994); *see also Lacy v. District of Columbia*, 424 A.2d 317, 321 (D.C. 1980) ("The substantial factor test . . . is part of the District's law of negligence[.]").

77.    The Capitol Police, Capitol Police Board, and ultimately Congress, as Lt. Byrd's employer, knew or should have known that Lt. Byrd was prone to behave in a dangerous or otherwise incompetent manner and owed Ashli a duty to use reasonable care in supervising, disciplining, and retaining Lt. Byrd.

78.    Less than two years before January 6, 2021, on or about February 25, 2019, Lt. Byrd left his loaded Glock 22 – the same firearm he used to shoot and kill Ashli Babbitt – in a bathroom in the Capitol Visitor Center (CVC) complex.  Lt.

Byrd's loaded Glock was discovered during a routine security sweep later the same day.  Approximately 15,00 to 20,000 people pass through the CVC, which serves as the main entrance for visitors to the U.S. Capitol, daily during peak season (March-July).  Lawmakers and staff charged with oversight of the USCP were not made aware of the incident until contacted by a reporter.[4]

79.    Lt. Byrd's police powers had been revoked on more than one occasion prior to January 6, 2021, for failing to meet or complete semiannual firearms qualification requirements.  In fact, Lt. Byrd had a reputation among peers for not being a good shot.  Under USCP's range management system, an officer who fails to meet firearm qualification requirements is given one week of remedial training.  If the officer still fails to qualify after remedial training, police powers are then revoked until the officer qualifies.

80.    Lt. Byrd's police powers also were revoked for a prior off-duty shooting into a stolen, moving vehicle in which the occupants were teenagers or juveniles. The stolen vehicle was Lt. Byrd's car.  Lt. Byrd fired multiple shots at the fleeing vehicle in a suburban area.  Stray bullets from Lt. Byrd's firearm struck the sides of homes nearby.  An official investigation found that Lt. Byrd's use of force was not justified.

81.    Lt. Byrd also had one prior use of force matter that was originally sustained by the Capitol Police.  He appealed and was found not guilty by the Disciplinary Review Board.

82.    On information and belief, there are additional incidents in Lt. Byrd's background that show the USCP knew or should have known Lt. Byrd would behave in a dangerous and/or otherwise incompetent manner.

83.    The Capitol Police, Capitol Police Board, and ultimately Congress, as

---

[4]  There had been at least three earlier incidents in which Capitol Police service weapons were left behind in inappropriate and unsafe places, demonstrating a clear pattern of inappropriate and unsafe practices by officers and improper supervision, discipline, and oversight by their employer.

Lt. Byrd's employer, breached their duty to Ashli to use reasonable care in the supervision, discipline, and retention of Lt. Byrd by retaining, promoting, and even allowing Lt. Byrd to serve as incident commander of the House chamber on January 6, 2021 despite multiple, serious warnings about his dangerous and/or otherwise incompetent behavior.

84. As a direct result of these and other breaches to be identified through discovery, Lt. Byrd shot and fatally wounded Ashli. The negligent supervision, discipline, and retention of Lt. Byrd was a substantial factor in Lt. Byrd's shooting and killing of Ashli, which was predictable, foreseeable, and avoidable but for the negligent supervision, discipline, and retention of Lt. Byrd.

85. The United States is liable for the negligent supervision, discipline, and retention of Lt. Byrd.

**COUNT V**

**<u>Negligent Training</u>**

**(Capitol Police, Capitol Police Board, *et al.* - ESTATE OF ASHLI BABBITT)**

86. Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

87. The Capitol Police, Capitol Police Board, and ultimately Congress owed Ashli a duty to train USCP officers, including Lt. Byrd, on the use of force in a manner consistent with generally accepted practices in law enforcement and the duty to act as a reasonably prudent police officer.

88. On August 23, 2021, the USCP's Office of Professional Responsibility issued a public statement asserting that Lt. Byrd's actions were "consistent with the officer's training." In his NBC Nightly News interview a few days later, Lt. Byrd also stated repeatedly that he followed his training in connection with the shooting.

89. Given the allegations herein and the assertions that Lt. Byrd followed his training, Lt. Byrd's use of force training was obviously deficient and/or inadequate. The areas in which Lt. Byrd's training was deficient and/or inadequate include firearm safety, threat analysis and perception, situational awareness, verbal

commands and subject control, tactics (defensive and operational), and making tactical decisions, among other topics.

90.     The applicable standard of care requires the Capitol Police, like any law enforcement agency, to conduct regular, in-service firearms training.  Officers must be adequately trained on the USCP's use of force policy.  The training also must reflect not only how to shoot (marksmanship, moving targets, moving officers, environment, etc.) but also scenario-based decision-making training regarding when to shoot.  The scenarios must encompass a full force continuum evaluation in terms of officer response.  The USCP's semi-annual qualification courses were inadequate for purposes of training its officers both in how to shoot and in making shoot-don't shoot decisions.  The USCP's classroom and/or online training also were obviously inadequate for these purposes.

91.     Lt. Byrd's training on First Amendment demonstrations, crowd control, breach and occupation of the Capitol, lockdowns, evacuations, breakdowns in command and control, and incident management also was plainly deficient and/or inadequate as alleged herein, as was training in radio communication, as demonstrated by Lt. Byrd's false, post-shooting radio calls.

92.     USCP's training of Sgt. Lively, Officer Yetter, and Officer Lanciano on situational awareness, crowd control, de-escalation techniques, communications, and other areas also was deficient and/or inadequate as alleged herein.  Sgt. Lively, Officer Yetter, and Officer Lanciano violated an order to guard and hold the Speaker's Lobby doors when they abandoned their position, after which Alam broke and dislodged the sidelight window where Ashli was shot and killed.  Sgt. Lively told investigators afterwards, "I grapple with this, you know, if I should've stayed." Officer Smith, the CERT leader, put it bluntly to investigators:  "I was thinking why, why the fuck did they leave."  Sgt. Lively and Officers Yetter and Lanciano knew or should have known that the CERT team in the hallway outside the Speaker's Lobby was not present to relieve them of their order to guard the lobby doors.  The actions

of Sgt. Lively, Officer Yetter, and Officer Lanciano demonstrate both incompetence and deficient and/or inadequate training.

93.     The Capitol Police, the Capitol Police Board, and ultimately Congress breached their duty to Ashli to use reasonable care in training Lt. Byrd, Sgt. Lively, Officer Yetter, and Officer Lanciano in a manner consistent with generally accepted practices in law enforcement and the duty to act as a reasonably prudent police officer as described herein.

94.     As a direct result of these and other breaches to be identified through discovery, Lt. Byrd shot and fatally wounded Ashli.  The negligent training of Lt. Byrd, Sgt. Lively, Officer Yetter, and Officer Lanciano was a substantial factor in Lt. Byrd's shooting and killing of Ashli, which was predictable, foreseeable, and avoidable but for the deficient and/or inadequate training of all officer and employees legally responsible for Ashli's death.  The Capitol Police, the Board, and the Congress were aware of the training deficiencies prior to January 6, 2021.

95.     The United States is liable for negligent training.

### COUNT VI
### <u>Survival Action</u>

**(Assault and Battery; Negligence; Negligent Supervision, Discipline, and Retention; Negligent Training - ESTATE OF ASHLI BABBITT)**

96.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

97.     Under the District of Columbia's Survival Act, D.C. Code § 12-101, on the death of a person in whose favor a right of action has accrued for any cause prior to her death, the right of action survives in favor of the legal representative of the deceased.

98.     As a direct and proximate result of the assault, battery, negligence, negligent supervision, discipline, and retention, and negligent training of Defendant United States and its employees, while acting within the scope of their office or employment, as alleged in this Complaint, Ashli suffered extreme, conscious pain and

1  suffering and mental anguish, emergency medical treatments, loss of projected future

2  income, and other damages cognizable under the Survival Act.

3     99.    Ashli's right of action for the injuries survives in favor of Plaintiff

4  ESTATE OF ASHLI BABBITT.

**COUNT VII**

**Wrongful Death**

**(Assault and Battery; Negligence; Negligent Supervision,**

**Discipline, and Retention; Negligent Training -**

**AARON BABBITT)**

10    100.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

11    101.    As a direct and proximate result of the assault, battery, negligence,

12  negligent supervision, discipline, and retention, and negligent training of Defendant

13  United States and its employees, while acting within the scope of their office or

14  employment, as alleged in this Complaint, Plaintiff AARON BABBITT, Ashli's

15  spouse, suffered damages, including his own pain, suffering, and emotional distress,

16  loss of Ashli's services and companionship, loss of Ashli's projected future income,

17  and other damages cognizable under the District of Columbia's Wrongful Death Act,

18  §§ 16-2701 *et seq*.

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of Plaintiffs and against Defendant United States of America in the full and just amount of Thirty Million Dollars ($30,000,000), plus costs and interest according to law, and any and all further relief to which Plaintiffs may be justly entitled.


Dated:  January 4, 2024                    Respectfully submitted,

JUDICIAL WATCH, INC.

By:    */s/ Robert Patrick Sticht.*
ROBERT PATRICK STICHT


By:    */s/ Paul J. Orfanedes*
PAUL J. ORFANEDES

Attorneys for Plaintiffs